Yang v. Mic Network Inc. Good afternoon, Your Honors. May it please the Court, James Freeman, Sanders Law Group, on behalf of the plaintiff, Steven Yang, who is a professional photojournalist who's worked for the New York Post for the last 10 years. On de novo review, Mr. Yang respectfully urges the Court to reverse dismissal of his copyright infringement claim on grounds that Mike's entitlement to a period of defense was not so clearly established on the basis of that complaint and its incorporated exhibits as to support dismissal as a matter of law. The Second Circuit's 2016 decision, TCA, provides a legal framework which can be used to vacate the District Court's Rule 12 decision in this case. The burden of proof, again, is plausibility. Now, I'd like to start by addressing the four factors that are well known under the Constitutional Act, Section 107. The first factor under Second Circuit law is the character and purpose of use, and there are three sub-factors, transformative use, whether or not the secondary use was commercial, and whether or not the defendant acted in bad faith. Now, with respect to the second and third sub-factors, the District Court actually found in Yang's favor, found that this was commercial exploitation and found that the defendant plausibly acted in bad faith by removing Yang's credit when it republished the Voter Act on the allegedly infringing article. Now, with respect to the transformative inquiry, which is the heart of the inquiry, there's three points that I'd like to make as to why this use is not transformative, or at the very least is only minimally transformative, such that it wouldn't support a finding of fair use under Rule 12 The first point is that the Mike Network article did not comment or criticize the merits of the photograph or the appropriateness of the photograph. Now, why is that important? Because the Second Circuit held in Authors Guild v. Google Inc. that, quote, copying from an original for the purpose of criticism or commentary on the original tends most clearly to satisfy Campbell's notion of transformative purpose involved in analysis of Factor I. And Judge Furman, in the case of Barcroft, indicated that a depiction of a controversial photograph might fairly accompany a work of commentary or criticism about the artistic merit or appropriateness of the photograph. Here, a careful analysis of the Mike Network article reveals there's zero commentary or criticism directed at the merits of the photograph or at the appropriateness of the photograph. But you know... Please go ahead, Judge Radjou. You know that your adversary's argument is that commentary was on what appeared in the post, which was an interview or interview statements with this man and his photograph. And so the commentary is, they would urge, on the absurdity of the whole thing. So what's your response to that? Well, that they would comment, first of all, the Mike Network article consists of 173 words. All of the words that are dedicated to criticism are dedicated, are leveling criticism at Dan Rauschheim, who is the subject matter of the photograph. Right. And he picked it in it. And so it's a commentary in the sense of, can you believe that this fellow, here he is, here's what he looks like, thinks that it's up to him to decide not to date certain women? I mean, you know, this is the suggestion is that it's all ludicrous. I understand the point that they're making. First of all, the New York Post article itself is a lampoon. That's our contention. Well, that's a debatable question, but... But that doesn't go to whether or not they're commenting on the article by saying, this is, I mean, there's, that's their theory, that the picture and the text are the article and that they are commenting on it being ludicrous. What's your response to that? The response is that there's no criticism, that they're solely using the photograph to identify Rauschheim and talk about Rauschheim. Our client doesn't own the copyright to Dan Rauschheim. Our client, the subject matter of the litigation, is his factorial rendition of Dan Rauschheim. There's no commentary or criticism directed at the factorial rendition. For example, in the, in the, in the matter of Clarkhurst Transportation Alternatives, which a judge, which the district court relied on, in that case the issue was that the secondary user was commenting on the New York Post editorial decision to use that specific photograph because it was incongruous between use of the photograph and the headline in that article. In this case, Mike Network has not commented on the New York Post editorial decision to hold any other photograph of Dan Rauschheim. Mike Network could have gone to Rauschheim's LinkedIn page or his Facebook page or could have gone to Google and taken any image of Rauschheim. Any image of Rauschheim would have proven the same point. So the photograph But, but, but if the comment was focused on the New York Post article as a whole, the presentation, I don't understand how you can separate the photograph from the article. It was a package that a reasonable observer would understand to be comment on the whole presentation, photograph with text. I don't, I don't see how you can separate them if the comment is on the whole presentation. It wasn't just that they needed a photograph of Dan Rauschheim. They were focusing on what the Post had to say in this way. Why, why is that incorrect? Yeah. Well, I'm sorry, Your Honor. So the distinction is that you have, you seriously have two copyrighted works at issue, right? You have the literary text that the New York Post published, which they own, that's the article itself. And then you have the photograph, which is a whole different copyright registration, a whole different work, it's editorial work. And the point that Your Honor is making is that these two have sort of been integrated or fused into one single work. But that's not, there's no precedent for that. The precedent that I've cited to the Court is that the commentary or criticism in the context of this case is, is that it, is the transformative inquiry is best amplified when you've got commentary or criticism directed at the merits of the work or at the editorial decisions you use that particular photograph. There's no commentary or criticism at all. Well, what do you point to as authority for saying that you can't treat them as a package if it's not a legitimate target of commentary to treat them as the Post's decision to run this photograph and this text? Well, what's interesting about this case, it's a novel case. We've never had a situation where a commercial news organization was found to be, the commercial news organization's use of a photograph from another commercial news organization was found to be fair use. And that really raises the second point. There was no transformation of the intended use of the photograph. The intended use of the photograph, the photograph was created for purposes of commercial news reporting. Mike Network used the photograph for the purposes of commercial news reporting. So there's like a horizontal market privity between the original use and the secondary use. And there is no precedent for that. That's really the purpose of this appeal. But the New York Post is what is called a tabloid. It's stories and it really can't be divorced from its pictures, that they are the critical element in almost all of their reporting. And so to the extent that the Post ran a story in which some fellow thought that he could decide that, you know, it just wasn't worth his while to date very attractive women, the defendant's publication is lampooning the whole thing. And the picture is integral to that, to making fun of it. I mean, are you suggesting that if they had said anywhere in their article, take a look at this guy, he's lucky he can get a date at all, that that would have been fair use. But because they didn't say so in so many words, that it's not fair use? What I'm saying is it's not fair use because in the cases of Ryan, I'm not a defendant, and in his report, and this is, you know, Dylan and Katz, the plaintiff copyright holder was actually the subject matter of the photographs. So for example, if Dan Rothschild were the plaintiff in this case, and he was a copyright holder in this case, and they were criticizing Dan Rothschild for all they're really doing in this article, then that would be a different case because it's unlikely that Rothschild would license his work or his face just to be criticized. So the idea that the court is getting at is that, well, this is an integrated article, they're commenting on the whole article, but just because Stephen Yang licenses photographs of the New York Post, he doesn't, you know, thereafter surrender his copyright to every downstream media company that wants to report on what the New York Post is reporting on. That's the problem here is that there is a distinction between the photograph and the article. Let me ask a separate, let me interrupt for just a second to ask a separate question, which I don't think, I'm sorry, I don't think is addressed in the complaint, but maybe you can give me some atmospherics. Was he, he was, he took this on assignment from the Post, but you described him as like a staff photographer. Was he free to license this photograph on his own account? Yes, Your Honor. I should say he's a free, he's an independent contractor, so he's been freelancing the New York Post for all these years. And, you know, the record shows that there was nine other lawsuits based on this exact same photograph. Why is that important? It's important to the fourth factor because it indicates that there was widespread market demand and a secondary market for the photograph. And what's happening here, if the court allows Mike Network to use the photograph in this manner, then that simply opens the floodgates for every other secondary news organization to use that photograph. And what does that do? That relegates Stephen Yang to one licensing fee. So his photograph becomes, quote-unquote, viral. There's huge market demand for it, but he can't deal with the fruits of his labor. Now, they simply called him on the phone, because they obviously knew who he was, he was credited in the New York Post, and said, hey, we'd like to run an article on this. And, you know, would you grant us a license? Of course he would grant a license. I mean, that's just how he earned a living. So the idea that we would just... Would the author of the Post article have to similarly grant a license for the screenshot that they ran of the cropped photo and some of the text of the article? I mean, would the Post have to then grant a license of some kind for Mike to run this satire? I don't represent the Post, but what I would say is that... But doesn't it, don't the same considerations... And they quoted maybe, I don't know, maybe 20 words? Don't the same considerations apply, though? Well, the consideration here is that they took, yes, they cropped the photo, but they took half the photo, and this is part of the photo, right? They took his face, which is really what the photo was the commentary, right? So, you know, you can't just take half, for example, of a musical recording. You couldn't just take half of John Lennon's Imagine and put it on your website and say, oh, well, I only took half of it, so it doesn't compete with the original. You couldn't record, you know, a movie, let's say Batman, half the duration of the movie, and then post it to a website with commercial advertising and say, oh, well, I only took half the movie, I can make money on it, I'm not competing with the original. And that's exactly what this report said here. And this report said that because the photograph was cropped, that it couldn't compete with the original full-scale image. And that logic just doesn't track. But the purpose of the use is what's critical. I mean, you know, to use your song analogy, we know what the answer to that is from the Supreme Court's Pretty Woman decision. So it's the purpose, and their argument is that the purpose was to be making critical commentary on the whole, the picture and the article. Yes, Your Honor, I understand the argument, but there are at least five or six cases in which the district courts found that there was a question of fact regarding whether or not the secondary user transformed the meaning or the character. And what we're urging the court to say here is really create, this is a very sophisticated, the New York Post article is very sophisticated. It sort of reminds me of like a Saturday Night Live skit where you're using a serious subject matter, like the war in Ukraine or COVID, and then they lampoon it. This is very similar here. They're talking about, you know, dating or, you know, relationships, right? But they're using Roshkind in a way that's humorous. They're ridiculing him. If you look at the language of the New York Post agreement, they're talking about high maintenance hotties. This is not a serious case. That's not a reference to him. That's a reference to the women he won't date any longer. Isn't that right? That's not a commentary on him. But the point is that the New York Post article on his case is very whimsical. It's satirical in its own right. So if the district court's conclusion was that Mike Network was using the photograph to cast Roshkind in a negative light, our argument is there's a question of fact as to whether or not the New York Post article itself was casting Roshkind in a negative light. Because how do you have transformation if they're both casting Roshkind in a negative light? You can only have transformation if you have one that's positive and the other that's negative. But our point is that is a very subtle, subjective, qualitative assessment that should not be determined on the basis of complaint. A reasonable jury could find that both articles were lampooning Roshkind. So then where's the transformative effect? And that's the point. It's not to put any burden on his appeals. But couldn't, I mean, I think the notion is that the Mike Network was lampooning the Post and the Post may have been or may not have been lampooning Roshkind. But this was a meta comment. And therefore, they stand in different positions. And that was the court's understanding. So it was a parody of what may or may not have been a parody. But in any event, we'll hear what your adversary has to say. Thank you, Your Honor. I appreciate your time. Good afternoon, Your Honor. My name is Eleanor Lackney from MSJ. It's a pleasure to be out in the courthouse. And it's a pleasure to be sitting here after this application. I think on the cost of appeal, I'd like to reserve two minutes for rebuttal on that. That's fine. So I'd like to address a couple of high-level points here and also address some of Commissioner Fitton's comments, as well as, of course, any questions the panel has. On fair use, to start with that, the plaintiff gave Judge Nathan two opportunities to determine whether this was fair use. There was a motion for reconsideration. The judge, this idea of saying that it was not so fairly established, Judge Nathan found three ways in which the use was transformative. And we can actually get into more. It was used to identify the subject of the controversy. And again, as depicted, it was a composite with the headline and the text, some of the text, and some of the other stuff. It was not just the image used to say this is what this guy is and to write the appeal in front of it. The image was recontextualized. That is key. It was used to mock the article and its subject. It used the screenshot of the portion of the article as a basis for its criticism. And it actually helped to tie the criticism and the comments to the article itself. So ultimately, rather than passing the subject in positive light or perhaps in absurd light, it transformed the object into an object of ridicule. This is a lot like what Judge Rodney and Judge Carney wrote in the Brown v. Netflix case, where part of the song was recontextualized and suddenly had no meaning. So again, this idea of saying that it was somehow not clearly established three ways is in one way or another. Three ways is another. Whether it was a ritual, was a lampoon or not, it doesn't really matter. If it was a straight article, if it was a satire, what Mike was talking about was the reaction from the public. The other comments about him, there were specific comments directed at the way he looked, the smug way he was sitting. There was the, quote, sorry ladies, but you just lost your chance with Mr. February for my passively hot substitute teacher's calendar. How on earth could anyone understand what was being discussed without using that portion of the article? And sure, his face was used, but using his feet would not be as effective. Beauty is skin deep, that's what this was about, that's why he was there. What about the argument that the Post was already in on the joke, that they were both making fun of Mr. Rothkind and his own image of himself as a hot commodity on the dating market, and that therefore there is no fundamental transformation in use? Sure, so it doesn't really make a difference. If it's a straight article, Mike's talking about the reaction from the public, and how they have a problem with the article, and how Twitter, they said that the article is, Twitter is going, you know, wild about this, Twitter's, you know, flashing back over this article, that's what it's about. So the fact that there was controversy is what's being reported on. Whether the public misunderstood it and thought it was a satire, I've never read it as a satire, it seemed pretty straight to me, the Post is what it is, but whether it was straight or not, Mike's article was a straight piece of news reporting, and it also talked about the public reaction to that article, whether they found the joke, got the joke, or didn't get the joke. So, I think this idea of saying this is a novel case, Bill Graham archives involved the use of revisionist posters in another context. Taken in full. Blanche v. Coons involved a photograph cut out and pasted in a piece of art. Second Circuit on-point cases, this is not a novel. This kind of scenario could have come up if this were a trend, if this were a checkboard, I would say a hundred years ago, but in half section 107, a hundred years ago, but it could have come up in the 1980s in the print magazine where someone was doing this. Could you take a minute and discuss the fourth factor, the effect on the market? Your colleague has said that this became a viral item and that there was great demand, the photograph was used and published and published and republished, and in Warhol Foundation recently, we said the secondary use, that we will take this into account when the secondary use occurs within a traditional or reasonable market for the primary work. So, why shouldn't we take some lost licensing fees into account here, where there clearly were many opportunities for Mr. Yang to profit from his creative work making the photograph? Actually, the nine other lawsuits all settled. We don't know, I have different contacts. We don't know if they settled and they weren't fair uses and they were taken down because they were effectively censored by the threat of litigation. But putting that aside, in Bill Graham Archives versus Orlin Kinnersley and in Swatch versus Bloomberg, the court unapprovedly held that it's actually circular to argue that a market exists because someone has made a fair use of it. The point is that, you know, in Office Go versus Google, same thing. If there's no commentary market, that's the point exactly. The point of fair use is to make the commentaries happen here. This concept of saying, oh, well, if Mike can make a fair use, then everyone can make non-fair uses, that doesn't apply. Well, every case is taken on its facts. This use by Mike is what matters, and it was in a fair use context. I do want to briefly cover the pieces and sections of the couple minutes I have left, just high level. Eldred versus Ashcroft talked about fair use and its relationship to the First Amendment and the underpinnings there. The court in the Ninth Circuit in civil productions, in awarding the fees, basically expressed a concern about the chilling effect on creativity if there was a cost involved in defending against fees. Judge Nathan talked and said, well, there were comparable arguments here, but that's not the test. That might be the test for Rule 11, but that's not the test for Section 505. The upshot here, and again, this is what Kurt's saying, and don't really contemplate it. Under Section 505, the upshot here is that you don't want to have to censor yourself. You need to either avoid any fair uses, any third-party release, any third-party content, because defending a claim is expensive, or you need to be prepared to pay a settlement amount and remove the image. That's what happens in these cases. Or you need to fight and to be quite candid. Not every party has the option to do this. Mike is able to afford this, but not every party can. What standard of review do we apply to the judge's decision? It is an abusive discretion standard, which he realizes is high. We believe, and in fact, there are two factors that weren't considered, and the plaintiff doesn't dispute that. We believe that the court, instead of looking at whether there were comparable arguments at some point, the court should have looked at the purpose of the fee award under Section 505, the purposes of the copyright. The question in those cases is not whether there are comparable arguments, but whether the lawsuit furthered the objectives of the Copyright Act. And here, as a practical matter, Mike has actually been hit with a lawsuit from the same counsel before and had to defend at great expense. The point is that Section 505 encourages defense of these types of claims to help ensure a proper balancing and calibration of copyright laws. And so, Judge Nathan, had that been considered, had the fact that there were no credible arguments put forth on some of the factors, or that all of them were in plaintiff's favor, the fact that this was prevailing three times over should have been considered under the more liberal standard that Section 505 allows. Thank you. Thank you very much. Mr. Friedman. Thank you, Your Honor. So, in rebuttal, I'd like to start. My esteemed colleague appeared to concede that one of the major points that this Court made is that the New York Post article portrayed Rothschild in a favorable light, whereas Mike Network portrayed it in a negative light. My esteemed colleague essentially conceded it doesn't matter. But we view that as a linchpin of the District Court's decision, because the only thing else that you're left with is this concept that Mike Network is entitled to use the photograph, not once, by the way, four times in the body of the article. This photograph was used four times. It was used three times in embedded tweets, which we did not contest because they were embedded, which brings up a lot of our postive issues. And they also used it as a banner to the article. And in addition to that, the exhibit leads to the complaint shows that it was used through social media. In other words, they used the photograph as a commercial billboard to direct traffic back to the Mike Network article. So what are you left with if my esteemed colleague concedes that it doesn't matter, you know, favorability versus negative? I thought that was part of their argument that it was used as part of news, that there was a controversy now that had arisen about this and they were reporting on that. Perhaps I misunderstood, but why don't you tell me why? My understanding is that there's really, even though I say three factors, the District Court accepted, there's really two factors. One was this idea of favorability versus negative light. And the other was that Mike Network was entitled to use the photograph to identify the New York Post article. And I have to ask the court. In reporting on the controversy that it then generated. To identify. But the question is, couldn't... But here's the question. Photographs the last 200 years since they were invented, every photograph that's ever been taken was identified as subject matter. And that's the whole point of photography. So identification is not transformative. They could have identified the New York Post article by simply citing the headline. They could have identified the New York Post article by providing a link, a URL link that directs back to the New York Post article and then the user could have gone to New York Post and seen the picture. Why should they be able to exploit the photograph on the face four times on the face of their own article when they had an alternative? Which is just to provide a URL link and allow the user to click back to the New York Post article and read the original. Why should they be able to do that? Just for identification purposes? The bottom line is the photograph wasn't necessary to identify the New York Post article. And they're talking about First Amendment right. Well, their First Amendment right to express the message they conveyed, it could have been effectuated by simply citing back the New York Post article. So what are you really left with here in transformative use? There's no commentary or criticism directed at the photo. You don't have any transformation between the original use and the secondary use. They're both in the same market. They're both right. And then the character of use, favorable versus negative, is a question of fact. It's an ultimate question of fact. Thanks very much, Mr. Friedman. Thank you, Your Honor. I'll leave it at that. So we'll stand on our feet in terms of the fees and sanctions. Thank you, Your Honor. I appreciate it. All right. If the Court doesn't mind, I know that Mr. Friedman raised some things that were not raised in the opening. I think it's important for the Court to understand, with respect to the Facebook point, I know this is part of its opening, but there was no allegation that Mike posted anything on Facebook. There was an allegation that a third party could post on Facebook. And this, again, I think it's important to understand that because it's just that what we've asserted is not true. With respect to the reason that he's leaving the Court, what we just heard here, it should have been necessary. The Court's Second Circuit rejected the second. The Second Circuit rejected the theory again, time and again. The theory that you need to benefit. You could license it if therefore it's not necessary. Excuse me. Are you arguing surrebuttal to counsel's argument? I thought you reserved this time to argue your counterclaim. Yes. So that's the point. So the thing is, we're hearing these arguments rehashed that are completely inconsistent with well-settled Second Circuit principles. In these types of circumstances, I know that the plaintiff wants to create a new market that doesn't exist. But that is not the purpose of the court system. We have cases that are well-settled. Blanche v. Coons, Schwab v. Boomer, Bill Graham, all these cases that are very, very good, and to require a party to have to defend a case like this is completely inconsistent with Section 505. The legal experts' history in this Court and the district courts of making these same arguments again and again and again and again and losing every time. Again, the challenge is for us, each individual is different. It's a living. It's for small publishers. It's not a living. It's a death sentence. All right. Thank you. Thank you. Mr. Freeman, you want any kind of quick ten-second? Yeah, quick ten-second. Actually, legalist law, I don't know how to work with that, but I did for four and a half years. Our track record on fair use dispositions was 17 victories versus eight losses. I contest it should have been 21 to 4, but it was something to lose on. The point being it wasn't blocked, but we're very familiar with the fair use doctrine, and we've developed the law in that area, I think, to the benefit of publishers and content creators. Thank you, Robert. Thanks very much to both of you. We'll reserve the decision.